# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**UNITED STATES OF AMERICA**
        **Plaintiff,**

    **v.**                          **Case No. 10-CR-247**

**JONATHAN ROCK**
        **Defendant.**

---

## DECISION AND ORDER

After encountering some problems in his Milwaukee neighborhood, defendant Jonathan Rock needed a new place to stay. He accepted his friend (and fellow gang member) Richard Perez's offer to move into a vacant home in Rockford, Illinois owned by Perez and Perez's mother. Shortly after defendant arrived at the Rockford home on September 1, 2010, the police – apparently summoned by neighbors concerned about the presence of people in this dilapidated and previously unoccupied home – entered without a warrant and observed a sawed-off shotgun. The officers seized the shotgun, arrested defendant and charged him with unlawful possession of the firearm under Illinois law. Later that day, a Rockford detective provided Miranda warnings and questioned defendant about the gun, but defendant invoked his right to counsel so the detective ended the interview. See Miranda v. Arizona, 384 U.S. 436 (1966) (holding that a person subjected to custodial interrogation must be advised of his rights to silence and counsel, and that if he invokes either of these rights interrogation must cease).

On September 14, 2010, City of Milwaukee detectives traveled to Rockford to question defendant about gang activities in the former jurisdiction, including shootings allegedly involving the seized shotgun. Defendant waived his Miranda rights and submitted to an interview in the

absence of counsel. After initially denying knowledge of the shotgun, towards the end of the interview defendant admitted that it had been transported from Milwaukee to Rockford in his car. On September 15, 2010, defendant requested to speak to the Rockford detective, who met with defendant and provided Miranda warnings, which defendant waived; defendant then made a statement about the shotgun.

Charged federally with unlawful transportation, 18 U.S.C. § 922(a)(4), and possession, 26 U.S.C. § 5861(d), of the short-barreled shotgun, defendant moved to suppress the firearm based on the officers' unlawful entry into the Rockford home and to suppress his September 14 and 15 statements as fruit of the unlawful search and based on a violation of his Fifth Amendment/Miranda rights.[1] See Edwards v. Arizona, 451 U.S. 477, 484-85 (1981) (holding that once an accused has expressed his desire to deal with the police only through counsel, the Fifth Amendment as implemented by Miranda forbids further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication with the police).

The magistrate judge assigned pre-trial proceedings in this case held an evidentiary hearing, then issued a recommendation that the motion be granted. Specifically, the magistrate judge found that defendant had a legitimate expectation of privacy in the Rockford home such that he had standing to challenge the warrantless search, and that the government failed to demonstrate the applicability of any exception to the warrant requirement. The magistrate judge then found defendant's arrest, based solely on the illegal search, also

---

[1]Defendant initially raised a Sixth Amendment challenge to admission of the statements as well, but he has since abandoned that argument. See Montejo v. Louisiana, 129 S. Ct. 2079, 2085 (2009) (holding that a defendant's waiver of his right to counsel under Miranda suffices to constitute a waiver of his Sixth Amendment right to counsel).

unlawful, and that defendant's subsequent statements should be suppressed accordingly. The magistrate judge further found the September 14 statement, taken in the absence of counsel, subject to suppression under Edwards, and, despite defendant's re-initiation of contact with the Rockford detective, that the September 15 statement directly flowed from the unlawful September 14 interview and thus should be suppressed for that reason as well.

The government objects to the recommendation, which requires me to review the matter de novo. See Fed. R. Crim. P. 59(b)(3). Neither side requests a de novo evidentiary hearing, and I find the record made before the magistrate judge sufficient to rule. See United States v. Raddatz, 447 U.S. 667 (1980). For the reasons set forth below, I agree with the magistrate judge that defendant had a legitimate expectation of privacy in the Rockford home, and that defendant's motion to suppress physical evidence must be granted accordingly. I further agree that the September 14 and 15 statements must be suppressed as fruit of defendant's unlawful arrest, and that the September 14 statement is independently subject to suppression under Edwards. I disagree with the magistrate judge only regarding the Fifth Amendment challenge to the September 15 statement. On this slightly modified basis, I will grant defendant's motion.

## I. FACTS

Defendant, age eighteen, testified that in August of 2010 he lived in an apartment on South 15th Street in Milwaukee, which he obtained through the juvenile justice system. (Apr. 20, 2011 Evid. Hr'g Tr. at 11-12.) Due to events in the neighborhood, defendant had to evacuate the apartment. (Id. at 12-13.) Defendant's friend Richard Perez (a/k/a "Flocko") told defendant that he and his mother owned a vacant home in Rockford, which defendant could move into immediately. (Id. at 14.) Defendant responded that he wanted to see the house first to determine whether it would work out. A day or two before his arrest, defendant, Perez, and

3

Perez's friend visited the house. Defendant testified that the house lacked running water, appliances or others furnishings, and needed a little work, but it had electricity, and no signs declared the home vacated or condemned. Defendant decided to move in, so he returned to Milwaukee the next day, packed up some belongings (a sofa bed and TV), and returned to Rockford, planning to buy other items he needed once he arrived. (Id. at 15-16, 23.)

Defendant testified that his girlfriend, Nora Romo; a friend, Andrew Gonzales; and someone named Olivia (last name unknown) were going to move to Rockford with him. (Id. at 16-17.) Accompanied by Perez and another person named Angel Hernandez, the group left Milwaukee at 9:00 or 10:00 p.m. on August 30 in defendant's car with the bed tied on the top and the TV in the trunk. (Id. at 17.) After getting lost and ending up in Chicago, they arrived in Rockford at about 3:00 a.m. on September 1 and stopped at Perez's mother's house so Perez could borrow his mother's car. Defendant went to a 24-hour Wal-Mart to buy some things for the house, including an inflatable bed (his bed got wet on the drive down), and some clothes. (Id. at 18-19, 24.) They then returned to Perez's mother's house at 4:00 or 5:00 a.m., and she drove them to the house where defendant was to stay. (Id. at 19.)

After they arrived at the house, defendant unpacked his belongings and started moving them inside. (Id. at 20.) After they set up his things, defendant and his girlfriend went to sleep for about ½ hour. They woke up when the others left and "started living around the house." (Id. at 21.) The police came about three or four hours after defendant arrived at the house. (Id. at 21.)

Defendant admitted that he paid no rent, signed no lease, and was given no key to the home. He explained that he did not need a key because Perez was with him when he entered. (Id. at 21, 25.) He did not notice whether Perez used a key to open the door; nor did he notice

4

whether the back door was off the hinges. (Id. at 21, 26.) He explained that Perez let him stay for free because they were "homies," i.e., members of the same gang (the Clanton 14th Street gang). (Id. at 25-26.) He stated that, aside from the aforementioned sofa bed and TV, he left his other belongings behind in Milwaukee. (Id. at 22.) He explained that he had nowhere to put his other belongings, and due to gang-related problems in Milwaukee he apparently had to move quickly. (Id. at 23.)

Rockford Police Detective Randy Peraza, a member of the gang unit on September 1, 2010, testified that on that date he was advised that patrol officers had detained two individuals and seized a shotgun at a location on 16th Avenue, which he knew from his experience as a gang investigator to be associated with the Perez brothers, members of the Clanton 14th Street gang. (Id. at 28-29.) Peraza responded to the scene and was advised by other officers that a neighbor had called the police to report individuals coming in and out of the vacant house. Peraza testified that the house appeared to be abandoned, with a lot of gang graffiti. (Id. at 30.)

Peraza did not participate in the initial entry and seizure of the shotgun; he arrived later. (Id. at 30.) He testified that the sergeant on the scene told him that the responding officers heard noises inside, went to the back door, which was off the hinges, entered the house to check, and found defendant and a female on the upstairs balcony. (Id. at 31.) Other officers outside the house apparently made eye contact with the individuals on the balcony and asked them to come down, but they did not, so officers went in and detained them, finding a shotgun in plain view. The officers did not have a warrant. (Id. at 31.)

Peraza testified that he knew the 16th Avenue residence was owned by the Perez family, and that Richard and his brother Henry used to live there. Their mother lived there as

5

well from about 2002 to 2004.  (Id. at 39.)  Peraza believed that Richard last lived there in about 2008.  (Id. at 44.)  Peraza testified that the property had since then been "abandoned," but he admitted that it had not to his knowledge been officially condemned by the city prior to defendant's arrest.  (Id. at 39-40.)  He testified that when the city declared a property abandoned it usually posted a sign, but he saw no sign on September 1 declaring this house abandoned.  After defendant's arrest, police called the property standards department, which condemned the house.  (Id. at 40.)

Following defendant's arrest on September 1, Peraza interviewed him at the Rockford Police Department.  (Id. at 32-33.)  Peraza read defendant his Miranda rights, and defendant agreed to talk.  Defendant stated that he was a member of the Clanton 14th Street gang in Milwaukee, and that his friend Flocko invited him to come to Rockford to look for work.  (Id. at 33.)  Defendant explained that he was moving into the residence on 16th Avenue, and that Flocko told him he could stay there.[2]  (Id. at 42.)  However, when Peraza asked defendant about the shotgun, defendant requested a lawyer, so Peraza ended the interview at that time.  (Id. at 33-34.)

Later on September 1, Peraza advised the "Milwaukee Intelligence Fusion Center" of defendant's arrest.  (Id. at 46-47.)  He later spoke to a Milwaukee police detective about the arrest.  (Id. at 48.)  He did not ask the Milwaukee detective to speak to defendant, and the detective did not tell Peraza that he was going to do so.  (Id. at 48-49.)

On September 14, 2010, City of Milwaukee Police Detective Thomas Obregon and his partner traveled to Rockford and interviewed defendant as part of their investigation into gang

---

[2]Peraza also interviewed defendant's girlfriend, who stated that she was moving into the Rockford residence with defendant.  (Id. at 42-43.)

violence involving the C-14s in Milwaukee.  (Id. at 50-51.)  Obregon testified that he told defendant that he was there to discuss shootings in Milwaukee, provided Miranda warnings, and defendant agreed to talk.  (Id. at 54.)  A recording of the interview, which lasted close to four hours and primarily concerned events in Milwaukee, was admitted in evidence at the hearing.  (Id. at 55-57; Ex. 3.)

At several points, the Milwaukee detectives asked defendant about the shotgun seized in Rockford, and whether it was the same gun used in gang-related shootings in Milwaukee; defendant generally stated that he did not know about the gun or where it came from.  (E.g., Ex. 3 at 1:25, 1:36, 1:38-:40, 1:48, 2:29, 2:37-:44, 2:54, 3:17.)  However, at about the 3:35 mark, defendant admitted knowledge of a Milwaukee shooting that involved the seized shotgun.  (Id. at 3:35-:37.)  One of the detectives stated, "That shouldn't have been that hard, Jonathan," and defendant replied that it was hard for him to speak about these matters.  (Id. at 3:37.)  He then told the officers whose gun it was and how it got from Milwaukee to Rockford.  (Id. at 3:39-:41.)  Defendant expressed doubt that his providing this information would help him with the Illinois charges, and one of the detectives asked, "Why didn't you tell the police here it wasn't your gun and who it belonged to?"  (Id. at 3:43.)  Defendant replied that he knows "the business" and that if he gets caught with something he has to take the blame.  (Id. at 3:44.)  He further noted that he did not tell the Rockford police whose gun it was, to which one of the detectives replied, "And that's where you went wrong."  (Id. at 3:45.)  Defendant then expressed frustration that despite providing the police with information such that he might be branded a snitch, his assistance would not get him off the hook regarding the Illinois charges he faced.  (Id. at 3:47-:48.)  Defendant made some additional statements about the gun and advised the Milwaukee officers that Peraza was the Rockford detective assigned to the case.  (Id. at 3:50-

7

52.)  The Milwaukee detectives indicated that they needed to speak to the Rockford police about defendant's case there and then ended the interrogation.  (Id. at 3:54.)

When Peraza arrived at work on September 15, his supervisor indicated that defendant had specifically asked to speak to Peraza.  Peraza, accompanied by another detective, traveled to the jail where defendant was being held, placed him in an interview room, confirmed that he wanted to talk, then provided fresh Miranda warnings, which defendant waived.  (Tr. at 35-36.) Defendant then made statements about the firearm and how it was transported from Milwaukee to Rockford.  (Id. at 37.)

The magistrate judge concluded that the discussion at the end of the September 14 interview motivated defendant to contact Peraza on September 15.  (Recommendation at 12.) However, Obregon denied telling defendant to ask to speak to the Rockford PD after their interview.  Obregon also denied consulting with the Rockford PD to make a plan to "get around" defendant's right to counsel.  (Tr. at 64.)

## II.  DISCUSSION

### A.    Physical Evidence

The sole issue in dispute on the motion to suppress the shotgun is whether defendant has Fourth Amendment  "standing" to challenge the warrantless search of the Rockford home. Because the government does not argue that any exception to warrant requirement applies, if defendant has standing the motion must be granted.  See United States v. Basinski, 226 F.3d 829, 833 (7th Cir. 2000) (holding that the government bears the burden of establishing that an exception to the warrant requirement applies).

In order to challenge this search, defendant must demonstrate a "legitimate expectation

8

of privacy" in the Rockford home, i.e., a subjective expectation of privacy that society is prepared to consider reasonable.  See, e.g., United States v. Curlin, 638 F.3d 562, 565 (7th Cir. 2011); United States v. French, 291 F.3d 945, 951 (7th Cir. 2002); United States v. Garcia, 897 F.2d 1413, 1418 (7th Cir. 1990).  Obviously, a person has a legitimate expectation of privacy in his own residence, and warrantless searches inside the home are deemed presumptively unreasonable. See, e.g., Payton v. New York, 445 U.S. 573, 586 (1980); United States v. Huddleston, 593 F.3d 596, 600 (7th Cir. 2010).  Moreover, because the Fourth Amendment protects people, not places, Katz v. United States, 389 U.S. 347, 351 (1967), it provides sanctuary for citizens wherever they have a legitimate expectation of privacy, id. at 359, including temporary dwellings such as a hotel room, e.g., United States v. Jerez, 108 F.3d 684, 690 n.4 (7th Cir. 1997), or the home of a host in which the person is staying overnight, e.g., Minnesota v. Olson, 495 U.S. 91, 95-96 (1990).  On the other hand, while an overnight guest in a home may claim the protection of the Fourth Amendment, one who is merely present with the consent of the householder may not be able to do so. Minnesota v. Carter, 525 U.S. 83, 90 (1998).  For instance, in Carter, the Court ruled that the defendant, temporarily visiting another's apartment for the purpose of conducting drug business, lacked a legitimate expectation of privacy in the apartment. Id. at 90-91; see also Terry v. Martin, 120 F.3d 661, 664 (7th Cir. 1997) (finding no legitimate expectation of privacy where the defendant was a temporary visitor, had no key to the apartment, no belongings there, and no intent to remain longer than necessary to complete a drug transaction).

The Seventh Circuit has identified various factors relevant to the expectation of privacy inquiry, including  (1) whether the defendant had a possessory interest in the place searched; (2) whether he had a right to exclude others therefrom; (3) whether he exhibited a subjective

expectation that the place remain free from governmental invasion; (4) whether normal precautions were taken to protect his privacy; and (5) whether he was legitimately on the premises. E.g., United States v. Carlisle, 614 F.3d 750, 758 (7th Cir. 2010). Of course, none of these factors are dispositive; a person lacking an ownership interest, the authority admit or exclude others, or even a key to the premises may, based on the overall circumstances, still have a legitimate expectation of privacy, see Olson, 495 U.S. at 98-100, while a person present legitimately (but transiently) may not, see Carter, 525 U.S. at 90-91.

Under the circumstances here, defendant had a legitimate expectation of privacy in the Rockford home. First, defendant testified without contradiction that he planned to make this house his new residence, establishing his subjective expectation of privacy. Cf. United States v. Ruth, 65 F.3d 599, 604 (7th Cir. 1995) (rejecting challenge to search where the defendant "repeatedly declined the opportunity to submit an affidavit or testify regarding his privacy interest"). The fact that the officers arrived before defendant spent much time in the house cannot be dispositive; otherwise, a new homeowner or leaseholder would lose the protection of the Fourth Amendment.[3] Defendant did not travel to the home for some limited (or unlawful) purpose, such as conducting a drug transaction or hiding contraband; rather, this was to be his home. See United States v. Brown, 64 F.3d 1083, 1085 (7th Cir. 1995) ("Everyone has a legitimate expectation of privacy in his residence.").

Second, defendant manifested an intent to make this house his home by bringing belongings, including a bed, and his girlfriend to live with him. He set up the bed and slept for at least a short period of time before the officers arrived. While it is true that defendant left his

---

[3]In any event, the Supreme Court has held that an individual may possess a legitimate expectation of privacy in even a temporary dwelling.

other property in Milwaukee, the record shows that he planned to buy – and, in fact, did buy – necessary items, including an inflatable bed and clothing, in Illinois.

Third, defendant had the permission of Perez and Perez's mother, the owners, to live in the house rent-free.  The fact that defendant stayed at the grace of the Perez family and lacked a key does not defeat his expectation.  See Olson, 495 U.S. at 98-100.  As the Olson Court explained, society recognizes the value of permitting another, "in between jobs or homes," to stay free of charge in a host's home.  Id. at 98.  Nor can the poor condition of the house defeat defendant's expectation.[4]  Many citizens live in dilapidated houses; they enjoy the same Fourth Amendment protection as the occupants of mansions.  Importantly, the house had not been condemned by the City of Rockford prior to defendant's arrest, despite the fact that police were apparently aware of it (and deemed it a gang house).  And as the magistrate judge noted, only vague hearsay supports the notion that the back door was "off the hinges."

In its objections, the government argues that defendant does not qualify as even an overnight guest under Olson, noting that defendant had been at the house for just a few hours before the police arrived, never spending a full night.  However, as discussed above, the evidence showed that the Rockford house was to be defendant's residence, not merely a temporary stop.  Thus, the fact that defendant had not yet spent a full night in the house has

---

[4]Nor will it do to characterize the house as "abandoned."  As the magistrate judge explained, abandonment is a term of art in Fourth Amendment jurisprudence, typically applied when a defendant discards a personal item such as a suitcase.  "The privacy interest in a dwelling is not so easily extinguished[.]" Brown, 64 F.3d at 1085.  The record contains no evidence that the Perez family "abandoned" this house in a legal sense, much less that defendant did so.  As the magistrate judge stated: "At most, the house was merely previously vacant.  A person legitimately and lawfully taking up residence in a once-vacant home does not lack a reasonable expectation of privacy simply because that home was previously vacant for a period of time."  (Recommendation at 5.)

11

little relevance.  The government argues that defendant's testimony that he planned to stay in the house is not corroborated by the evidence.  But it is undisputed that defendant brought a bed with him to Rockford (and purchased another bed when the original got wet on the drive down); why would defendant bring a bed to Rockford if he did not plan to sleep there?  True, he left other possessions in Milwaukee, but he testified that he planned to buy other things he needed once he arrived (and, in fact, he did buy some things at the 24-hour Wal-Mart).

The government notes that the Rockford house had been vacant for several years and was not defendant's "host's home," as in Olson.  But it is undisputed that the Perez family maintained ownership of the home, even after they moved out; the home had not, at the time of defendant's arrest, been condemned, foreclosed, or otherwise seized.  Citing United States v. Whitehead, 415 F.3d 583, 588  (6th Cir. 2005), the government further argues that given its condition this house could serve no "residential function."  This case is nothing like Whitehead.  First, while the Rockford home needed work, there is no evidence that it was, when defendant arrived on September 1, 2010, "unlivable," like the property at issue in Whitehead.  Id. at 588.  Second, the defendant in Whitehead conceded that the house at issue was not his residence.  Rather, he visited the property as a guest of the "resident," a homeless person who admitted to the police that he was "squatting in the location."  Id. at 587.  Based on the absence of any evidence linking the defendant to the residence, the Whitehead court concluded that he visited the house for the purpose of engaging in drug-related business transactions.  "And Whitehead's own admission that he . . . never once slept at the house precludes application of the Supreme Court's conclusion that 'an overnight guest in a home may claim the protection of the Fourth Amendment.'"  Id. at 588 (quoting Carter, 525 U.S. at 90).  Here, defendant intended to make the Rockford house his residence, brought a bed for

that purpose, and slept for at least a short time before the police arrived.[5]

The government argues that the purpose of defendant's visit was to conduct illegal activity, i.e. to hide a firearm used in gang-related shootings in Milwaukee. However, the government points to no evidence in the record supporting this suggestion. Defendant testified without contradiction that he traveled to Rockford to move into a new residence. Defendant's admitted membership in a gang, the home's association with the gang, and the shotgun's seizure from the home are insufficient to support the government's speculation. It seems highly unlikely that defendant would have toted a bed from Milwaukee to Rockford if his true purpose was merely to hide contraband.[6]

Finally, the government argues that four of the five <u>Carlisle</u> factors weigh against a finding in defendant's favor. However, these factors should not be applied in checklist fashion; indeed, under that type of analysis the overnight guest in <u>Olson</u> would lose. Under the particular circumstances of this case, where defendant intended to make the house his residence, received permission from the owners to stay rent-free, moved possessions (including a bed) into the house, and "started living around the house," his expectation of privacy must be respected.

---

[5]Likewise distinguishable is <u>United States v. Sculco</u>, 82 F. Supp. 2d 410, 415 (E.D. Pa. 2000), in which the court denied standing to a defendant who "was permitted to enter the house when he wanted" but "was not there very much and did not sleep over." Here, defendant intended to make the house his residence and brought a bed for that purpose. Thus, he is not properly characterized as "a non-overnight social guest," as in <u>United States v. Johnson</u>, No. 08-cr-30036, 2008 WL 5244847, at *2 (S.D. Ill. Dec. 16, 2008), or the guest of a guest, as in <u>United States v. McNeal</u>, 77 F.3d 938, 945 (7th Cir. 1996), the other cases the government cites.

[6]Further, as the magistrate judge noted, the Fourth Amendment would mean little if it did not apply to properties suspected to be connected to criminal activity, like the alleged "gang hideout" at issue here. (Recommendation at 6.)

For these reasons and those stated by the magistrate judge, I find that defendant had a legitimate expectation of privacy in the Rockford home. Because the government established no exception to the warrant requirement justifying the search, defendant's motion to suppress physical evidence must be granted.

## B.    Statements

The government does not object to the magistrate judge's conclusion that defendant's arrest flowed directly from the seizure of the shotgun. Nor does the government dispute the general rule that a confession obtained through custodial interrogation following an illegal arrest must be excluded, see, e.g., Taylor v. Alabama, 457 U.S. 687, 690 (1982), or argue that any intervening events broke the causal connection between the arrest and the statements. The mere provision of Miranda warnings, which is all the record shows here, will not suffice to purge the taint of an unlawful arrest. See Brown v. Illinois, 422 U.S. 590, 601 (1975). Thus, defendant's September 14 and 15 statements must be suppressed as fruit of his unlawful arrest.

The government also impliedly concedes that (regardless of the legality of defendant's arrest) the September 14 statement must be suppressed under Edwards. It is undisputed that defendant invoked his right to counsel on September 1, he remained in custody thereafter, counsel was not provided to him at the September 14 interview, and he did not reinitiate communication with the police prior to that interview. As the magistrate judge explained, the Edwards rule is not offense-specific; thus, the fact that the Milwaukee officers questioned defendant primarily about other crimes does not matter; "the presumption raised by a suspect's request for counsel – that he considers himself unable to deal with the pressures of custodial interrogation without legal assistance – does not disappear simply because the police have

14

approached the suspect, still in custody, still without counsel, about a separate investigation."
Arizona v. Roberson, 486 U.S. 675, 683 (1988). Accordingly, even if defendant's September
1 arrest was entirely lawful, the September 14 statement must be suppressed under Edwards.

The government does argue that the September 15 statement, which followed
defendant's request to speak to Peraza, need not be suppressed. Because defendant
reinitiated contact with the police before the September 15 interview, his prior invocation of the
right to counsel would not bar admission of this subsequent statement under Edwards.

Before the magistrate judge, defendant conceded that he reinitiated contact but argued
that his September 15 statement constituted the "fruit" of the improperly obtained September
14 statement. He indicated that his statement to Peraza about the shotgun was essentially the
same as his statement to Obregon; he basically decided to cut his losses by initiating a
conversation with Peraza about the same events to which he confessed the day before to
Obregon. Defendant argued that he was placed in this position only because the Milwaukee
police did not honor his right to counsel invoked on September 1. (Def.'s Post-Hr'g Br. [R. 29]
at 19.) However, defendant did not argue that any particular exchange with the Milwaukee
police prompted him to talk to Peraza. Nor did he cite any authority for his argument that the
fruit of the poisonous tree doctrine applies to Miranda violations; the Supreme Court has
suggested that it does not (at least not to the same extent as in the Fourth Amendment
context). See, e.g., United States v. Patane, 542 U.S. 630, 637 (2004) (plurality) (concluding
that failure to give a suspect Miranda warnings does not require suppression of physical fruits
of suspect's unwarned but voluntary statements); Missouri v. Seibert, 542 U.S. 600, 612 n.4
(2004) (plurality) (declining to overrule Oregon v. Elstad, 470 U.S. 298 (1985), which rejected
the fruit of the poisonous tree doctrine in the Miranda context). In his response to the

15

government's objections, defendant again cites no authority and simply quotes the magistrate judge's recommendation.

The magistrate judge found the September 15 statement subject to suppression because it flowed directly from the unlawful September 14 interrogation.[7] Specifically, the magistrate judge found that defendant became motivated to speak to Peraza when the Milwaukee officers suggested that he may not receive consideration on the Illinois charges based on his cooperation with them; the magistrate judge pointed to the response of one of the Milwaukee officers – "that's where you went wrong" – to defendant's statement regarding his failure to discuss the gun with Rockford authorities.

In a situation such as this, where the defendant made successive statements, the first taken in violation of <u>Miranda</u> (or <u>Edwards</u>), the second not, the admissibility of the second statement should be determined under the test(s) set forth in <u>Seibert</u>.[8] In <u>Seibert</u>, the Court declined to adopt an automatic rule of exclusion of the second statement under the fruit of the poisonous tree doctrine. <u>See</u> 542 U.S. at 612 n.4 (plurality). Rather, a plurality of the Court held that the relevant inquiry is "whether it would be reasonable to find that in these circumstances the warnings could function effectively as <u>Miranda</u> requires." <u>Id.</u> at 611-12

---

[7]The magistrate judge also noted that the government failed to present any argument as to the voluntariness of the September 15 statement. (Recommendation at 12.) It is true that the government in its post-hearing brief did not address voluntariness, instead focusing on defendant's (since abandoned) Sixth Amendment challenge to these statements (Govt.'s Resp. Br. [R. 30] at 6), but neither did defendant make a voluntariness challenge to either of his statements. In any event, as discussed below, the government does address voluntariness in its objections to the recommendation.

[8]<u>Seibert</u> involved a situation where the officers failed to provide any <u>Miranda</u> warnings before the first statement; however, I see no reason why a different test would apply to a second statement taken following a violation of <u>Edwards</u>.

(plurality).  Relevant factors include (1) the completeness and detail of the questions and answers in the first round of interrogation, (2) the overlapping content of the two statements, (3) the timing and setting of the first and the second interviews, (4) the continuity of police personnel, and (5) the degree to which the interrogator's questions treated the second round as continuous with the first.  Id. at 615 (plurality).  Concurring in the judgment, Justice Kennedy suggested a narrower approach, concluding that the second statement should be suppressed only when the police acted in a "calculated" fashion in order to undermine the suspect's Miranda rights.  See id. at 622 (Kennedy, J., concurring).

The Seventh Circuit, in attempting to divine the controlling rule from Seibert, has noted that only two Justices appeared to endorse Justice Kennedy's intent-based test.  United States v. Heron, 564 F.3d 879, 884-85 (7th Cir. 2009) (declining for this reason to adopt Justice Kennedy's approach as the rule of the case under Marks v. United States, 430 U.S. 188, 193 (1977)).  In Heron, the court analyzed the challenged statement under both Justice Kennedy's intent-based approach and the plurality's multi-factor approach.  564 F.3d at 886.  Likewise, in United States v. Lee, 618 F.3d 667 (7th Cir.  2010), the court noted that two tests had emerged from Seibert, and it had yet to choose which test should govern and thus analyzed the issue under both tests.  Id. at 678-79.  More recently, however, the court of appeals has suggested that Justice Kennedy's approach does represent the controlling rule.  See United States v. Littledale, No. 10–3063, 2011 WL 2708633, at *3 (7th Cir. July 12, 2011) ("There can be no finding of an improper two-step interrogation, however, unless the officers deliberately withheld Miranda warnings until after the suspect confessed."); United States v. Vallar, 635 F.3d 271, 285-86 (7th Cir. 2011) ("We have construed Seibert as holding 'that post-warning statements are inadmissible if they duplicate pre-warning statements intentionally elicited in an

17

effort to evade Miranda.'") (quoting United States v. Peterson, 414 F.3d 825, 828 (7th Cir. 2005)).  Given the uncertainty, I will analyze the issue under both tests.

There is no evidence of a plan or design on the part of Milwaukee and Rockford police to evade Edwards.  Peraza testified without contradiction that he did not, after alerting Milwaukee police of defendant's arrest, prompt Milwaukee detectives to speak to defendant; nor did Milwaukee police tell Peraza that they planned to question defendant.  Similarly, Obregon testified without contradiction that the Milwaukee police never told defendant to reinitiate contact with Rockford authorities.  Obregon likewise denied consulting with the Rockford police to devise a plan to "get around" defendant's right to counsel.  Thus, the September 15 statement need not be suppressed under Justice Kennedy's approach.  Nor must it be suppressed under the Seibert plurality's approach.  While the two interviews occurred in the same place and within a day of each other, they were conducted by different authorities and covered different ground; the Milwaukee police were primarily concerned with gang violence in that city, while the Rockford detective focused on the gun.  There is no indication that the second session was treated as continuous with the first.  Some of the discussion at the end of the first interview may have prompted defendant to request the second interview, but there is no indication that the fresh Miranda warnings Peraza provided on September 15 could not function effectively.

Finally, as the government notes, there is no evidence that the September 14 statement was involuntary (as opposed to taken in violation of Miranda/Edwards), or that the police threatened, tricked, or forced defendant to speak to them on September 15.  Peraza confirmed that defendant wanted to speak to him on the latter occasion, provided new warnings, and defendant then voluntarily made a statement.  Defendant makes no argument to the contrary.

18

Therefore, I decline to order suppression of the September 15 statement based on the earlier Fifth Amendment/<u>Edwards</u> violation. As discussed above, however, the statement will be suppressed under the Fourth Amendment.

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that the magistrate judge's recommendation is adopted in part as stated herein, and defendant's motion to suppress (R. 13) is **GRANTED**.

Dated at Milwaukee, Wisconsin, this 20th day of July, 2011.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge